845 F.2d 327
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
R.S.C., INC., CHEM-TECH SERVICES CORP., Plaintiff-Appellant,
v.
S.M.E. CEMENT, INC., Defendant-Appellee,
U.S. Gypsum Company, Intervenor-Appellee.
 No. 86-3677.
 United States Court of Appeals, Sixth Circuit.
 April 29, 1988.
 
 Before WELLFORD, DAVID A. NELSON and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 After acquiring title to a quantity of cement that had been stored in defendant S.M.E. Cement's silos for some years, plaintiff Chem-Tech eventually removed the cement pursuant to a replevin order obtained in a diversity action against SME. Finding that there was not as much usable cement as it had thought, Chem-Tech asserted a claim against SME for the value of the shortfall. The district court determined that the shortfall had resulted primarily from the self-destructing properties of the cement, and the court awarded damages only for the loss of a small quantity attributable to SME's negligence in bagging the cement. A storage contract between SME and Chem-Tech's predecessor in title said that SME would be "solely and totally responsible" for any shortage, but the district court held that Chem-Tech was not entitled to the benefit of that provision.
 
 
 2
 The district court further held that Chem-Tech was not entitled to recover the costs of transporting the cement from the silos to its ultimate destination; that SME was entitled to recover its outstanding storage charges; and that Chem-Tech would have to indemnify its predecessor in title, U.S. Gypsum Company, for storage charges that a state court had previously ordered U.S. Gypsum to pay. Finally, the district court imposed sanctions for certain irregularities that occurred during pre-trial and post-trial discovery proceedings.
 
 
 3
 We shall affirm the judgment of the district court as to all issues raised on appeal.
 
 
 4
 * The cement involved in this case is a fast-setting product called "VHE cement." It has a high sulfur trioxide content that, as the district court found, "causes it to lump or clump more [than ordinary Portland cement]...." The district court also determined that "[b]ecause the VHE cement is much finer than ... Portland cement, it 'bulks' more and tends to 'pack set,' meaning that the molecules in the cement will align themselves and not move, more than with the Portland cement." Because "the nature of storage results in wastage as moisture attacks cement and causes lumping and crusting," the usual practice within the industry is to use VHE cement "within one or at most two construction seasons;" storage for extended periods "is not customary," the court found.
 
 
 5
 In the late 1970's, U.S. Gypsum arranged to have SME produce 2,640 tons of VHE cement and store it in two silos. Under a storage contract dated April 20, 1982, SME assumed sole and total responsibility for any damage to the cement during storage, and U.S. Gypsum represented that it would remain the owner of the cement throughout the term of storage.
 
 
 6
 U.S. Gypsum's efforts to market the VHE cement were not too successful. On August 1, 1982, therefore, USG disposed of the remaining cement--thought to be 1,838 tons--by selling it to plaintiff Chem-Tech, a U.S. Gypsum sales representative, for $10 and Chem-Tech's agreement to assume responsibility for all storage charges.
 
 
 7
 Chem-Tech failed to pay any storage charges. In May of 1983, in the course of unrelated litigation between U.S. Gypsum and SME in the Court of Common Pleas of Stark County, Ohio, SME filed a counterclaim against U.S. Gypsum for its unpaid storage charges. U.S. Gypsum, in turn, attempted to bring a third-party action against Chem-Tech as the entity ultimately responsible for the charges.
 
 
 8
 Although an employee of Chem-Tech accepted service of the third-party complaint in California, Chem-Tech filed no response, and U.S. Gypsum obtained a default judgment. An attorney for Chem-Tech subsequently entered an appearance and had the default judgment vacated. No further action was taken against Chem-Tech in the state case, and on December 4, 1984, the Common Pleas Court entered judgment in favor of SME against U.S. Gypsum for accrued storage costs in the amount of $70,000.
 
 
 9
 The federal district court proceedings were initiated on October 5, 1984, when Chem-Tech filed a replevin action against SME. The district court issued an order of possession on October 19, 1984, but Chem-Tech procrastinated in removing the cement. The district court eventually ordered Chem-Tech to pay $12,500 in storage charges for the first five months of 1985, and later ordered payment of $3,750 in storage charges for the next three months.
 
 
 10
 When Chem-Tech finally began serious efforts to remove the cement, it found that the quantity of cement that was usable was substantially less the 1,838 tons purchased from USG. Chem-Tech then filed an amended complaint against SME seeking judgment for the value of the shortfall, and SME counterclaimed for unpaid storage charges.
 
 
 11
 U.S. Gypsum intervened in the federal court action to assert a claim against Chem-Tech for the storage charges it had been ordered to pay by the state common pleas court. Chem-Tech then filed a counterclaim against U.S. Gypsum for failing to deliver the full 1,838 tons of cement.
 
 II
 
 12
 The case was tried to the district court, sitting without a jury. One of the conclusions reached by the district court was that U.S. Gypsum was not liable to Chem-Tech because Chem-Tech had actually obtained title to at least 1,838 tons of cement.
 
 
 13
 On appeal, Chem-Tech argues that because the agreement under which it purchased the cement from U.S. Gypsum is a document of title under the Uniform Commercial Code, U.S. Gypsum is liable to Chem-Tech for damages caused by the nonreceipt or misdescription of the goods. See O.R.C. Sec. 1307.08.
 
 
 14
 The district court concluded that there was no nonreceipt or misdescription, and we agree. As the district court noted, SME's inventory records showed that 1,927.50 tons were in storage at the time of the contract. Cement that had "lumped" or "crusted" had to be discarded, and some cement was lost in the bagging process, but U.S. Gypsum was not responsible for these loses; the contract of sale specified that USG was making "no warranty of any kind" and was not to be liable for any losses "directly or indirectly arising from the storage, sale, handling or use of" the cement.
 
 III
 
 15
 * The storage agreement entered into between SME and U.S. Gypsum in April of 1982 contained a provision that read as follows:
 
 
 16
 "Lessor [SME] shall remove and deliver to USG's [U.S. Gypsum's] designee specified quantities of stored material on receipt of written instructions from USG. Lessor shall exercise all possible care in the handling and storage of said material and shall be solely and totally responsible for any damage, shortage, or other adverse developments occurring with respect to such material from the time of its purchase by [U.S. Gypsum] until it has passed from the custody and control of Lessor."
 
 
 17
 Chem-Tech claimed that it was a third-party beneficiary of this contractual provision, and that SME was therefore responsible to it for the full amount of the difference in value between the quantity of cement that Chem-Tech purchased from U.S. Gypsum and the quantity of usable cement ultimately removed from the silos. The district court rejected this claim, reasoning that Chem-Tech's contract of purchase, under which Chem-Tech assumed the risk of loss of the product, abrogated any obligation of SME toward Chem-Tech as a third-party beneficiary of the storage agreement.
 
 
 18
 We do not believe that Chem-Tech is entitled to the status of a third-party beneficiary of the storage agreement under the governing state law. This is a diversity case, so questions as to choice of law rules are controlled by the law of the forum. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941). The forum in this case is Ohio. Ohio law provides that the parties to a contract may designate the state law under which the contract will be interpreted unless the chosen state has no substantial relationship to the parties or the transaction, or unless application of the chosen law would be contrary to a fundamental policy of Ohio. Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436 (1983). See also O.R.C. Sec. 1301.05.
 
 
 19
 SME's storage agreement with U.S. Gypsum specifies that the agreement is to be "construed according to the laws of the State of Illinois." The agreement recites that U.S. Gypsum's principal offices are in Chicago, so the contract appears to bear a reasonable relation to Illinois. Ohio has no fundamental policy against application of Illinois law here.
 
 
 20
 Under Illinois law, a stranger to a contract cannot sue thereon unless the contract manifests an intent to confer a benefit on him. Such an intent "is 'to be gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution.' " Bates & Rogers Construction Corp., et al. v. Greeley & Hansen, 109 Ill.2d 225, 232 (1985) (quoting Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 258 (1931), as quoted in People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc., 78 Ill.2d 381, 385 (1980)). "[A] party relying on a third party beneficiary theory must take the contract as the original parties made it and is bound by all of its provisions." Chicago White Metal Casting, Inc. v. Treiber, 162 Ill.App.3d 562, 576 (2d Dist.1987).
 
 
 21
 Read as a whole, the storage agreement manifests no intent to confer a benefit on any party other than U.S. Gypsum, the owner of the cement. The agreement provides "that any and all such material stored by USG hereunder is and will remain throughout the term of storage the separate and exclusive property of USG." Other provisions require SME to obtain insurance on behalf of USG and to indemnify USG for losses of cement, but we find no indication that either of these provisions was intended to run to any third party.
 
 
 22
 "In Illinois, the promisor's intention must be evidenced by an express provision in the contract identifying the third-party beneficiary." Wheeling Trust & Savings Bank v. Tremco, Inc., 153 Ill.App.3d 136, 140 (1st Dist.1987). In Wheeling Trust, an express reference to the plaintiffs' construction location as the delivery site for goods was held insufficient to identify the plaintiffs as third-party beneficiaries. In the case at bar, therefore, the fact that U.S. Gypsum reserved the right to require SME to deliver specified quantities of cement to U.S. Gypsum's "designee" cannot, as a matter of law, make such an unidentified "designee" the beneficiary of a provision under which SME assumes responsibility for any damage or shortage occurring "from the time of its purchase by U.S. Gypsum until it has passed from the custody and control of [SME]." We are confirmed in this conclusion by the fact that the agreement contains an express representation that all of the cement "is and will remain throughout the term of storage the separate and exclusive property of U.S. Gypsum." The fast-setting properties of VHE cement strongly suggest, moreover, that it would have been utterly unreasonable for SME to assume full responsibility toward an unidentified designee who might let the cement languish in SME's silos for months or years.
 
 B
 
 23
 The district court correctly analyzed SME's duty to Chem-Tech under O.R.C. Sec. 1307.27(A)(2) and Sec. 1307.09(A), which require bailees and warehousemen to exercise the care of "a reasonably careful man." A five percent loss found to have been incurred in SME's bagging of a part of the cement was held to have been the result of a lack of reasonable care on SME's part, and the district court therefore awarded Chem-Tech $800.64 for the loss of 4.17 tons of cement attributable to SME's negligence in bagging.
 
 
 24
 The district court attributed the rest of the shortage to the makeup of the cement and the length of time the cement was stored, "both factors being matters which were beyond the bailee's control and exercise of due care." Chem-Tech's president and two employees of SME testified that the cement had to be screened before it was loaded into trucks for delivery. Cement that would not pass through the screen was discarded because it did not meet Chem-Tech's quality standards. On one occasion, Chem-Tech returned a load of cement with too many "chunks;" that load, too, was discarded. The district court also noted that "[a]pproximately 50-60 tons of VHE cement in the form of lumps, chunks, and crusted cement remain in SME's silos numbers eight and ten, none of which can be removed in a marketable form."
 
 
 25
 On appeal, notwithstanding the district court's findings to the contrary, Chem-Tech argues that the evidence shows that the cement became unusable because the silos were poorly constructed and water leaked into them. A district court's findings are presumptively correct and will "not be set aside unless clearly erroneous," Rule 52(a), Fed.R.Civ.P. We see nothing "clearly erroneous" in the district court's meticulous fact-finding with regard to the deterioration of the cement. The district judge's findings were based on what he heard from the witnesses, what he saw on visits to the storage silos, and personal observation of the cement. We are in no position to disturb those findings.
 
 
 26
 Chem-Tech notes in its brief that certain SME employees for whom subpoenas had been issued failed to appear at trial, while one expert witness was not allowed to testify fully; these witnesses, according to Chem-Tech, would have bolstered its claim that the silos leaked and caused the cement to hydrate into concrete. Chem-Tech also asserts that it was error for the court to allow two SME expert witnesses to testify.
 
 
 27
 We do not find that the district court abused its discretion in any way. One Chem-Tech expert witness was not allowed to give opinion testimony because he had not been listed in the discovery documents or the witness list. The district court later noted that it was unsure that Chem-Tech would have been able to establish this witness as an expert in any event. This was obviously the trial court's call. See Fed.R.Evid. 702, Notes of Advisory Committee on Proposed Rules ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier.") The Chem-Tech expert witness who was properly designated was allowed to testify. As to the failure of SME employees to appear at trial, Chem-Tech's counsel did not have them personally served and expressly declined to institute contempt proceedings. We can hardly reverse the judgment on the basis of speculation as to the content of testimony that was never given.
 
 IV
 
 28
 With regard to SME's counterclaim against Chem-Tech for storage charges, Chem-Tech asserted that it had an oral agreement with SME under which SME waived its right to collect storage fees from Chem-Tech. The district court found, however, "that the testimony of Mr. Rice on Chem-Tech's claim of an oral agreement to store the VHE cement without cost is not credible." We cannot say that the district court's credibility finding is clearly erroneous, given the fact that Mr. Rice, the president of Chem-Tech, had trouble explaining what benefit the waiver of storage charges conferred upon SME, and given the fact that he had made a misrepresentation to the court earlier as to his availability for a deposition.
 
 
 29
 The court granted judgment to SME against Chem-Tech for the value (calculated at $1,250 per month) of nine and one-half months' use of one silo and ten and one-half months' use of the second silo. These periods followed those for which SME had obtained judgment against U.S. Gypsum in the state common pleas court. Chem-Tech argues that these damages were not sufficiently proven and were not correctly calculated.
 
 
 30
 Chem-Tech asserts first that there was no evidence that the storage fees were $1,250 per month per silo or that the fees had not been paid. SME responds that the original contract between U.S. Gypsum and SME and the storage agreement entered into in April of 1982 establish that U.S. Gypsum's storage fees were $1,250 per month per silo. This is competent evidence of the value of the storage SME was providing. By stipulation, the district court was also entitled to rely on evidence introduced in the state court proceedings as to the storage charges. The president of Chem-Tech admitted at trial, moreover, that storage charges for the two silos were "$2500 a month."
 
 
 31
 Second, Chem-Tech contests a finding that SME's conduct in removing cement from both silos simultaneously, rather than one silo at a time, was not "negligent or unreasonable based upon the condition of the cement and SME's demonstrated interest, willingness, and efforts to remove the cement as expeditiously as possible." Chem-Tech's assertions in this regard do not make the district court's finding clearly erroneous. Chem-Tech does not say how many months of storage fees would have been saved if one silo had been completely emptied before SME started on the second silo, but it would appear to be one or two months at most. This hardly compels the conclusion that SME wrongfully attempted to increase its income from the storage charges. On the contrary, as the district court repeatedly noted, it was Chem-Tech that kept dragging its feet on the removal of the cement, thereby increasing its liability for storage charges.
 
 
 32
 Third, Chem-Tech argues that the district court erred in its findings as to the dates on which the silos were actually emptied. The district court was overseeing the removal of the cement, however, and was closely in touch with what was happening. The court set July 15, 1985, as a deadline for removal of all cement, and the court indicated that it would entertain a motion to dismiss Chem-Tech's complaint if it failed to remove the cement by then. As a follow-up on that order, the court held an evidentiary hearing on August 26, 1985, at which time Chem-Tech's counsel stated:
 
 
 33
 "Silo No. 10, I believe, has some crusted material that may render one truckload of useable material. It may not. But for all practical purposes Silo 10 has been emptied, and the witness can correct me if I'm wrong, but I think the last two weeks, perhaps three weeks, all efforts will be concentrated on Silo No. 8."
 
 
 34
 On August 29, 1985, the court entered an order requiring Chem-Tech to remove the cement by December 1, 1985, and directing the parties to file a status report by October 1, 1985. Chem-Tech's October status report indicated that the silos still had not been emptied. We are at something of a loss to understand how this court could be expected to set aside the district court's determination that storage fees would have to be paid through mid-October.
 
 V
 
 35
 The district court ruled in favor of U.S. Gypsum on its claim for indemnification in respect of the state common pleas court judgment for storage costs. Conceding that "[u]nder Ohio law, in order for a party who is secondarily liable to seek indemnity from one who is primarily liable, the latter must be fully and fairly informed of the claim against the former, and the pendency of the action, and given full opportunity to defend or participate in the defense," the district court found Chem-Tech had such notice and opportunity and could not "after having sought to escape participation in the state court proceedings, assert that it did not have the opportunity to oppose SME's claim when in fact it was Chem-Tech that wanted to avoid having its day in court to oppose SME's charges."
 
 
 36
 On appeal, Chem-Tech does not deny that it had a contractual obligation to indemnify U.S. Gypsum for storage charges. It argues, rather, that it was not given notice and an opportunity to defend the state court action as required by the holding in Ohio Casualty Ins. Co. v. Ford Motor Co., 443 F.Supp. 80, 82 (S.D. Ohio 1977). The district court's findings to the contrary are not clearly erroneous. The record is clear that U.S. Gypsum was trying to bring Chem-Tech into the common pleas case as a third-party defendant. The president of Chem-Tech testified that he was aware of that lawsuit as early as February 17, 1984, when he received a copy of U.S. Gypsum's third-party complaint. He admitted he knew the litigation concerned storage charges for the VHE cement. U.S. Gypsum's attorney testified that he had spoken to Chem-Tech officials and had asked for their help in defending against SME's claim for storage charges. The opportunity afforded Chem-Tech more than satisfied the standards of Ford Motor Co., supra, if those standards are applicable here.
 
 VI
 
 37
 Although Chem-Tech's pleadings did not request judgment for costs incurred in removing the cement from SME's silos, at trial Chem-Tech introduced evidence of transportation costs, unspecified professional fees and expenses (including "waiting time"), equipment rental charges, and bond premiums paid or incurred in connection with the removal of the cement. Chem-Tech now asserts that it was error for the district court not to grant judgment for such costs. In this connection Chem-Tech cites O.R.C. Sec. 2737.14, which states:
 
 
 38
 "In an action to recover possession of personal property in which an order of possession has been issued, the final judgment shall award permanent possession of the property and any damages to the party obtaining the award to the extent the damages proximately resulted from the taking, withholding, or detention of the property by the other, and the costs of the action."
 
 
 39
 SME responds that the district court did not award "permanent possession" of the cement under the replevin order, but simply permitted Chem-Tech to obtain possession for the time being after posting a $500,000 bond. The fact that storage charge fees were later awarded to SME is said to be evidence that SME's possession of the cement was lawful under the Warehousemen's Lien Statute, O.R.C. Sec. 1307.14, and that SME's withholding of delivery was not subject to any of the sanctions of Sec. 2737.14.
 
 
 40
 We need not reach that question because, as we see it, the expenses Chem-Tech incurred were not the proximate result of any "taking, withholding, or detention of the property" on SME's part. The original contract between SME and U.S. Gypsum said that SME was providing "finished cement, placed in storage and loaded for shipment." The subsequent storage agreement provides that "lessor shall remove and deliver to USG's designee specified quantities of stored material on receipt of written instructions from USG." In the context of the previous contract we do not read the storage agreement as requiring delivery off the premises. The president of Chem-Tech admitted at trial that delivery was to be at the storage silo. Shipping charges were Chem-Tech's responsibility, and Chem-Tech suffered no damage in having to pay them.
 
 VII
 
 41
 * Chem-Tech objects to certain sanctions imposed by the trial court both prior to and after the trial. The imposition of sanctions was occasioned by an intentional misrepresentation on Chem-Tech's part that its president would not be available for a deposition on a particular date; it was represented that the witness was scheduled to attend a hearing in his divorce case in Los Angeles two days later. SME proved that the divorce case had been taken off the court's docket and that no hearing was scheduled for the day on which it was said to have been set.
 
 
 42
 Chem-Tech's brief does not discuss the fact that this misrepresentation was the reason attorney's fees were assessed. Chem-Tech argues instead that the "totality of the circumstances" indicated that the company was trying its best to make its president available for deposition, and thus sanctions were not appropriate. Making misrepresentations to a court is a serious matter, however, and the trial court did not abuse its discretion in imposing sanctions here.
 
 B
 
 43
 Sanctions were also imposed by a magistrate who was appointed to supervise the post-trial proceedings. The magistrate explained that Chem-Tech had moved to stay post-judgment depositions of its officers pending appeal of the case, but the district court had denied the motion. SME subsequently received notice by telephone that the deponents would not appear at certain scheduled depositions, and SME then moved for an order compelling discovery. A request for attorney's fees and expenses was included in this motion. Chem-Tech responded with a motion asking for the court's protection from SME's "spurious" motion to compel. The motion alleged that although SME's attorneys acknowledged that the scheduled depositions would not go forward, they "advised that a motion compelling attendance at said depositions would be filed in the district court." Finding Chem-Tech's allegations "inconsistent" because "[i]f there had been some agreement on the depositions, it would have been paradoxical for SME's counsel to assert that a motion to compel discovery would be forthcoming," the magistrate denied Chem-Tech's motion for a protective order. The magistrate also declined to compel depositions that had been scheduled prior to his assignment to the case, but he granted the request for fees.
 
 
 44
 Rules 26(c) and 37(a)(4), Fed.R.Civ.P., allow for the award of attorney's fees to the opponent of a protective order motion if it is denied. The magistrate specifically stated that fees were being awarded pursuant to Rule 26(c). Accordingly, Chem-Tech's argument that there was no basis for imposition of attorney's fees because SME's motion to compel was not granted need not be considered.
 
 
 45
 The judgment of the district court is AFFIRMED.
 
 
 46
 WELLFORD, Circuit Judge, concurring in part and dissenting in part.
 
 
 47
 All the parties in this case were familiar with the special properties of VHE Cement, particularly U.S. Gypsum ("USG") and defendant SME. The latter agreed in its contract with USG to produce and store 2640 tons of this cement in two of its silos. The April 20, 1982 storage contract obligated SME to be "solely and totally responsible for any damage, shortage, or other adverse developments occurring with respect to such material from the time of its purchase ... until it has passed for the custody and control of Lessor [SME]." (Emphasis added). If Chem-Tech, plaintiff herein as assignee or designee of USG's contract, may benefit from this unequivocal assumption of liability by SME, then the defendant SME may not escape responsibility for the shortage and adverse developments that occurred while it had possession of the product, which it produced and obligated itself to deliver. Illinois law is to be applied with respect to interpretation of this contract, but Ohio law is controlling in setting out the relationship between Chem-Tech, purchaser of 1838 tons of VHE cement in question, and USG.
 
 
 48
 As between Chem-Tech and USG, their 1982 agreement provided that "risk of loss to product" was upon Chem-Tech, which also assumed "full responsibility for storage charges for product." USG made no warranties about the cement to Chem-Tech and assumed no liability for expenses relating to "storage sales, handling, or use of product." At the time, SME's records indicated it had in excess of 1957 tons in storage.
 
 
 49
 I agree with the holding that Chem-Tech was liable to SME for proper storage charges under its agreement with USG. There was a shortage, found by the district court, of more than 368 tons in the amount of VHE cement delivered from SME's two silos. The district court concluded that Chem-Tech could not recover from SME for this loss because SME had only the legal responsibility under Ohio law as warehouseman of exercising reasonable care under the circumstances. Although he acknowledged that SME as bailee or warehouseman had the burden of proof "on the issue of the bailee's conduct," (citing David v. Lose, 7 Ohio St.2d 97 (1966)), the district judge found that the loss was due to "chemical makeup of the cement," and that there was "no negligence" on the part of SME. The district court, however, did not discuss the effect, if any, of SME's contractual undertaking to be totally responsible for any shortage, or whether Chem-Tech stood in USG's shoes in that regard as purchaser of the cement.
 
 
 50
 Judge Nelson's rationale as to the application and interpretation of Illinois law on the latter questions was not apparently considered by the district court. I believe the clear weight of evidence compels a finding that SME was negligent and responsible to some extent for leakage in the silos. The district court was incorrect in binding Chem-Tech to its assumption of risk of loss as to USG in respect to its holding Chem-Tech responsible for virtually all of the loss as between Chem-Tech and SME as bailee-warehouseman. I harbor a definite misgiving about attributing almost the entire loss, then, to Chem-Tech absent further consideration of these issues by the district court. I would therefore remand these proceedings to the district court to consider what it originally ignored--whether or not in some fashion Chem-Tech was able to rely on SME's original unconditional responsibility for shortage or loss, something much beyond the liability of a bailee or warehouseman.
 
 
 51
 I do agree with Judge Nelson's ruling against Chem-Tech's claim of oral agreement by SME to waive storage charges and I am in agreement with sections II, V and VI of the opinion. I would also affirm the disposition on sanctions.